```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION


Michael Johnson,                    )
                                    )
          Plaintiff,                )
                                    )
                                    )
     v.                             )   No. 19 C 4993
                                    )
                                    )
Wexford Health Sources Inc.,        )
Marian Hollaway, Estate of          )
Saleh Obaisi, Wendy Olsen,          )
Randy Pfister, David Gomez,         )
John Baldwin, Rob Jeffreys,         )
Lieutenant Ronald L. Amos,          )
Correctional Officer Levon          )
Powell, and Other John Doe          )
Defendants,                         )
                                    )
          Defendants.               )
```

Memorandum Opinion and Order

Michael Johnson, an inmate at Stateville Correctional Center ("Stateville") and later Pontiac Correctional Center ("Pontiac"), brought this suit against various prison officials and healthcare providers under 42 U.S.C. § 1983 for alleged Eighth Amendment violations arising from the medical care he did or did not receive while incarcerated. He also sues Wexford Health Sources, Inc. ("Wexford"), Charles Truitt--the current Warden of Stateville-- and Latyoa Hughes--the current Acting Director of the Illinois

Department of Corrections ("IDOC")--in their official capacities for the alleged violations.[1]

The "Wexford Defendants," consisting of Wexford, Nurse Marian Hollaway,[2] and the Estate of Saleh Obaisi, and the "IDOC Defendants," consisting of Wendy Olsen, Randy Pfister, Truitt, John Baldwin, Hughes, Lieutenant Ronald L. Amos, and Correctional Officer Levon Powell, now move for summary judgment. For the reasons given below, the motions are granted.

I.

The following facts are undisputed except where noted. On December 3, 2016, Johnson injured his toe and eye while trying to get into his bunk bed. Johnson Resp. to Wexford Defs.' Statement of Material Facts ("Resp. to Wexford SMF") ¶¶ 14-15, ECF 172. He was seen by Dr. Aguinaldo (not named as a defendant in this lawsuit) on December 5, 2016, who ordered x-rays of Johnson's skull and toe. *Id.*

Sometime between 5:00 a.m. and 6:00 a.m. on December 17, 2016, Nurse Hollaway, accompanied by Officer Powell, was doing medical rounds and approached Johnson's cell to provide him with previously

---

[1] At the time of filing, David Gomez was the Warden of Stateville and Rob Jeffreys was the IDOC Director. I grant Johnson's request to substitute the individuals currently in those roles for his official capacity claims.

[2] Nurse Hollaway's last name is spelled as "Holloway" in the fifth amended complaint, but she spells it "Hollaway" at her deposition, so that is the spelling I use here.

2

prescribed Tylenol 3, a pain medication consisting of Tylenol plus codeine. *Id.* ¶¶ 16-17; Johnson Resp. to IDOC Defs.' Statement of Material Facts ("Resp. to IDOC SMF") ¶ 44, ECF 169. As Johnson attempted to get down from his top bunk to retrieve the medication, he fell onto the floor of his cell. Resp. to Wexford SMF ¶ 16. Johnson told Nurse Hollaway that he was in pain, but when she offered him the Tylenol 3, he did not take it. *Id.* ¶¶ 21-22. Johnson wanted to be taken on a stretcher to the health care unit, but Nurse Hollaway told him that there was not a doctor on site yet. *Id.* ¶ 18. Nurse Hollaway could see some blood on Johnson's lip and/or cheek and on the floor, but she could tell Johnson had a pulse, was breathing, and was conversing in complete sentences. *Id.* ¶¶ 23, 30; IDOC Defs.' Resp. to Johnson's Statement of Add'l Material Facts ("IDOC Resp. to SAMF") ¶ 15, ECF 180.

Nurse Hollaway completed her medical rounds and reported--according to her testimony, by telling a coworker--what had happened. Resp. to Wexford SMF ¶ 24. Around 6:40 a.m., a medical technician accompanied by Lieutenant Amos assessed Johnson in his cell, where he was still on the floor. Resp. to IDOC SMF ¶¶ 29, 33. Another medical technician, defendant Olsen, was summoned to Johnson's cell at about 9:10 a.m. *Id.* ¶ 20. She entered Johnson's cell and assessed him. *Id.* ¶ 23.

Johnson was taken to the health care unit by another nurse at 1:30 p.m., where he was treated by Dr. Aguinaldo around 2:10 p.m.

3

*Id.* ¶ 31; Wexford Resp. to SAMF ¶ 18. Dr. Aguinaldo noted dried blood in Johnson's nose, but no swelling or tenderness, and that Johnson was neurologically intact. Resp. to Wexford SMF ¶ 34. He ordered x-rays of Johnson's toe and gave him crutches. *Id.* The next day, on December 18, 2016, Johnson told a nurse, "I don't need to see you. I just saw the doctor yesterday. I'm straight." *Id.* ¶ 36.

Johnson's next appointment was on December 22, 2016, this time with Dr. Obaisi. *Id.* ¶ 37. At the appointment, Dr. Obaisi reviewed the results of Johnson's toe x-ray with him, explaining that he had a fracture, but that it was in a good position. *Id.* Dr. Obaisi advised Johnson to follow up in a few weeks for further examination. *Id.*

On December 23, 2016, Johnson received x-rays of his skull, right shoulder, nasal bones, and lumbar spine. *Id.* ¶ 38. A radiologist determined that all except the lumbar spine yielded normal x-rays. *Id.* As for the spine, the radiologist found a "pars interarticularis defect in the lumbar spine with spondylosis," which is "wear and tear." *Id.*

Johnson saw Dr. Aguinaldo again on January 7, 2017, reporting no new problems and requesting a renewal of his Boost nutritional supplement, which Dr. Aguinaldo provided. *Id.* ¶ 39.

On January 11, 2017, Johnson saw Dr. Obaisi again and reported continued toe soreness and back pain. *Id.* ¶ 40. Dr. Obaisi noted

4

that the x-ray of Johnson's back was normal and diagnosed him with a back sprain. *Id.* In response to Johnson's complaint that the Tylenol 3 he was prescribed upset his stomach, Dr. Obaisi changed his prescription to Tramadol and Robaxin. *Id.* ¶¶ 41–42. A couple of days later, Dr. Obaisi also issued a permit requesting that Johnson be assigned to a low bunk. *Id.* ¶ 44. He also ordered another x-ray of Johnson's foot, which took place on January 15, 2017, and which a radiologist found showed a well-healing fracture. *Id.* ¶¶ 42, 45.

At a follow-up four weeks later, Dr. Obaisi renewed Johnson's Boost prescription, increased his Tramadol prescription from 50 mg to 100 mg, and extended his low bunk medical permit. *Id.* ¶¶ 47, 49, 51. Dr. Obaisi also requested that IDOC officials allow Johnson to bring more ice than is typically allowed to his cell. *Id.* ¶ 51. Dr. Obaisi saw Johnson for the final time on February 9, 2017, where he reviewed Johnson's chart and confirmed he was capable of transferring prisons. *Id.* ¶¶ 52, 54. Before being transferred, Johnson saw a nurse on February 16, 2017, reported his back still hurt and received ibuprofen. *Id.* ¶ 55. He then went on a hunger strike from February 17, 2017 through February 22, 2017. *Id.* ¶ 56. Johnson saw a different physician on March 2, 2017, who gave him Robaxin. *Id.* ¶ 57. Johnson was transferred from Stateville to Pontiac on March 8, 2017. *Id.* ¶ 58.

Johnson filed several emergency grievances during his time at Stateville and Pontiac, but the only ones that form the basis for his claims were submitted on December 4, 2016--which recounts his toe and eye injuries sustained while trying to get into his bed-- and December 29, 2016--which recounts the fall and subsequent events of December 17, 2016. Those grievances were denied by then-Warden of Stateville Pfister. *See* Fifth Am. Compl. Exhs. B–C, ECF 108-2, 108-3. Johnson appealed the denial of those grievances, but the appeals were denied, with then-IDOC Director John Baldwin signature appearing on the form concurring in those denials. *See id.* Exh. J, ECF 108-10.

## II.

"Deliberate indifference to a prisoner's serious medical needs may constitute cruel and unusual punishment under the Eighth Amendment." *Hildreth v. Butler*, 960 F.3d 420, 425 (7th Cir. 2020) (citation omitted). A deliberate indifference claim has both an objective and a subjective component. First, a prisoner must establish that he had an objectively, "sufficiently serious" medical need. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997)). Second, he must demonstrate that "prison officials acted with a 'sufficiently culpable state of mind'--i.e., that they both knew of and disregarded an excessive risk to inmate health." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quoting and citing

6

*Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); additional citation omitted).

Wexford Defendants concede that Johnson's toe injury was sufficiently serious to satisfy the objective component of the inquiry, but contend that his back pain was not. IDOC Defendants make no argument on the point. "A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe*, 631 F.3d at 857 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Here, it is undisputed that Johnson fell from the top bunk onto the floor of his cell, which resulted at least in a bloodied nose and back pain. A lay person could readily conclude that back pain resulting from a fall like that would necessitate medical care.

### A.

Johnson must next demonstrate that, as a subjective matter, defendants were deliberately indifferent to his medical needs. The first batch of defendants consists of those responding to Johnson's fall on December 17, 2016, including Nurse Hollaway, Officer Powell, Lieutenant Amos, and Olsen. Johnson's complaint as to these defendants is that they did not secure him medical care quickly enough. Specifically, he faults them for not calling the fall in as an emergency, which would have brought more medical personnel

7

to his cell, and for not bringing him to the health care unit sooner to be evaluated by a physician. But "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties v. Carter*, 836 F.3d 722, 730-31 (7th Cir. 2016) (en banc) (citations omitted). Johnson does not put forth any evidence that the approximately nine-hour period between when he fell and when he saw Dr. Aguinaldo exacerbated any of his injuries. And to the extent he claims the delay unnecessarily prolonged his pain, that claim is belied by the fact that he admits Nurse Hollaway offered him pain medication immediately after the fall, but he did not take it. For this reason alone, summary judgment is appropriate as to Nurse Hollaway, Officer Powell, Lieutenant Amos, and Olsen. But there are additional reasons why Johnson fails to satisfy the subjective prong of the deliberate indifference test as to each of these defendants.

Starting with Hollaway, some facts around her response to Johnson's fall are disputed, but it is undisputed that after the fall, Johnson was breathing, had a pulse, and was conversing with Hollaway. Furthermore, it is undisputed that she offered him Tylenol 3, a pain medication, while he was lying on the ground,

8

but that he refused this medication.[3] Based on this evidence, a factfinder could not conclude that Hollaway's determination that Johnson could safely remain in his cell exposed him to a substantial risk of excessive harm. At worst, her failure to get him to the health care unit more quickly could be construed as negligent, but negligence does not violate the Eighth Amendment. *See id.* at 728 ("[S]howing mere negligence is not enough." (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); additional citation omitted)).

Defendant Olsen was summoned to Johnson's cell at 9:10 a.m. the morning of the fall, at which point Johnson claims she failed to provide him with medical treatment. But like Hollaway, Johnson lacks evidence that Olsen acted with the requisite deliberate indifference to maintain his claim against her. She conversed with him, entered his cell to assess him, and noted his complaints before telling him that he could sign up for sick call. As with Hollaway, the record is devoid of evidence from which a jury could conclude that Olsen was constitutionally required to do more.

Johnson claims broadly that Hollaway and Olsen should have given him more medical care than they did, but he does not identify what ailment he needed care for at that moment. That the medical

---

[3] Johnson argues that Hollaway was already required to provide this pain medication to him even prior to the fall--indeed, it was for that purpose that Hollaway came to Johnson's cell at all that morning--but does not explain why that matters.

9

care Hollaway and Olsen provided was adequate or, at worst, negligent, is underscored by the care Johnson received when he finally did see Dr. Aguinaldo around 2:10 p.m. that day. None of the care Dr. Aguinaldo provided--a physical examination, cleaning dried blood from his nose, ordering x-rays, and giving him crutches--suggests that Johnson was suffering from an urgent medical need when Hollaway and Olsen encountered him, and Johnson does not explain with any specificity what more they should have done.

Johnson also pursues claims against Officer Powell and Lieutenant Amos. Officer Powell accompanied Nurse Hollaway to Johnson's cell and witnessed his fall. Johnson maintains Officer Powell should have helped him get medical attention because of the fall. But as a non-medical official, Officer Powell is entitled to "reasonably rel[y] on the judgment of medical professionals." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *see also Greeno*, 414 at 656 ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." (citation and quotation marks omitted)). While a lay person might know that Johnson needed some care following his fall, the record does not support Johnson's contention that even a lay person would have known that he needed more care than Nurse Hollaway provided, especially because he declined the pain medication she offered.

10

Nor am I persuaded by Johnson's argument that, when Officer Powell saw him, he was not yet "under the care" of medical staff but rather he was seeking to be under that care. He was under Nurse Hollaway's care as she examined him and offered him medication.

The same goes for Lieutenant Amos, who accompanied a medical technician to Johnson's cell. Johnson seeks to hold Lieutenant Amos liable for the same reasons as Officer Powell, but as with Officer Powell, Lieutenant Amos reasonably relied on the judgment of the medical technician he was with when he saw Johnson.

B.

As for Dr. Obaisi, Johnson maintains that his failure to order additional imaging of Johnson's back constituted deliberate indifference.[4] In Johnson's view, Dr. Obaisi should have ordered an MRI when Johnson returned to him in January with back pain, having already received an x-ray. Decisions about which type of medical imaging is appropriate fall well beyond the ken of a lay person, so Johnson must show that Dr. Obaisi's decision not to order an MRI between the time of Johnson's fall on December 17, 2016 and Johnson's departure from Stateville on March 8, 2017 was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [he] did not base

---

[4] Johnson makes no argument regarding the treatment of his toe, so to the extent his claim is based on that health issue, it is waived.

11

the decision on such a judgment." *Petties*, 836 F.3d at 729 (citations and internal quotation marks omitted); *see also Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." (citations and internal quotation marks omitted)). "[E]xpert medical evidence is often required to prove this aspect of [the] claim." *Eagan v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021) (citations and internal quotation marks omitted).

Johnson has not submitted either a report or deposition from a retained medical expert. Instead, his sole evidence that Dr. Obaisi's failure to order additional imaging reflected a complete lack of medical judgment is the following deposition testimony given by Dr. Aguinaldo:

> Q. . . . Is there ever any instance where you would request an MRI following a patient's fall?
>
> A. If that the case, if they really need MRI, most of the time, I have to refer it--I have to refer it to the medical director, sir.
>
> Q. How often do you refer to the medical director for MRIs?
>
> A. It depends what's the problem. Like, for instance, that kind of problem, they keep on coming back to me, and I ordered x-rays, and I did physical examination, then I have to refer to the medical director. Then, it's up to the medical director that they order an MRI.

> Q. How many times would you see a patient before you would refer them to the medical director?
>
> A. Let's say, for instance, I see him today, and I see him--I give some medication, and order some x-rays. I did not find out anything. Then still complaining something, and that's the time I have to refer to the medical director. So, the medical director decide whatever kind of test he will order.
>
> Q. So, you would see the patient twice before you refer them to the medical director?
>
> A. Probably after one time I refer right away. Not twice already. That's too much.

Aguinaldo Dep. 36:13–37:13, ECF 158-3. But a reasonable jury could not conclude, based on this evidence alone, that Dr. Obaisi should have ordered an MRI after Johnson's first visit and receipt of an x-ray. At most, this testimony suggests that Dr. Aguinaldo, "most of the time" when presented with a patient complaining of pain and who has received x-rays showing nothing, would refer the case to the medical director for instruction on what to do next. *See Petties*, 836 F.3d at 728 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." (emphasis in original) (citation omitted)). It does not suggest that accepted medical judgment would have compelled the medical director to order an MRI. Setting aside that Johnson points to no evidence that Dr. Obaisi indeed failed to refer the case to the medical director, one can only guess based on this testimony what the medical director would have done if he did. In other words, Johnson has

13

presented no evidence that, upon any application of medical judgment, Dr. Obaisi should have ordered Johnson an MRI.

C.

Johnson's claims against Pfister and Baldwin--the Warden at Stateville and IDOC Director during the relevant period--are based on denials of Johnson's emergency grievances. Both Pfister and Baldwin argue that they delegated review of grievances to subordinates so, despite their signatures appearing on the denials, they never actually reviewed them. Accordingly, in their view, they lacked personal knowledge of Johnson's complaints and on that basis cannot be held liable under § 1983. *See, e.g.*, *Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is 'no personal involvement by the warden [in an inmate's medical care] outside the grievance process,' that is insufficient to state a claim against the warden." (quoting *Gevas v. Mitchell*, 492 F. App'x 654, 660 (7th Cir. 2012)). Like other courts in this district, however, I am skeptical that prison officials may escape liability simply by delegating grievance review to an unidentified subordinate, especially where the grievance determinations bear the official's signature. *See Brown v. Carter*, No. 13 C 2775, 2017 WL 2362597, at *2 (N.D. Ill. May 31, 2017); *Zirko v. Ghosh*, No. 10 C 08135, 2015 WL 6447768, at *15 (N.D. Ill. Oct. 26, 2015); *Goodman v. Carter*, No. 2000 C 948, 2001 WL 755137, at *5 (N.D. Ill. July 2, 2001).

14

I need not resolve that issue, however, because Pfister reasonably relied on medical staff to make decisions regarding Johnson's treatment. "Prison directors and wardens are 'entitled to relegate to the prison's medical staff the provision of good medical care.'" *Gevas*, 492 F. App'x at 660 (quoting *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); additional citations omitted). Johnson filed a grievance on December 29, 2016, recounting his December 17th fall and how Wexford and IDOC staff responded. *See* Fifth Am. Compl. Exh. C, ECF 108-3.[5] The grievance itself explains, however, that Johnson was seen by two medical technicians and a sick call nurse, and that Johnson was "examined by Dr. A" (presumably Dr. Aguinaldo), who ordered x-rays and gave him crutches to assist him. *Id.* at 3. Far from suggesting Johnson was not receiving treatment for his back pain, the grievance itself

---

[5] Johnson does not cite in his summary judgment submissions to the grievances on which he bases his claim against Pfister, so I presume the possible candidates are those attached to his fifth amended complaint. Because, as observed above with respect to his toe injuries, Johnson's submissions make clear that his claims are premised on (1) how he was treated the day of his December 17, 2016 fall and (2) how his back pain was treated from that day on, I decline to consider the grievances submitted on December 3, 2016, and December 4, 2016, which concern events predating the December 17th fall and that Johnson has made no effort to pursue at this stage. *See* Fifth Am. Compl. Exhs. A–B, ECF 108-1, 108-2. The subsequent grievances attached to his fifth amended complaint came after he was transferred from Stateville to Pontiac Correctional Center, so Pfister would not have played any role in responses to them. *See id.* Exh. E, ECF 108-5 (grievance submitted at Pontiac on April 8, 2017); *id.* Exh. F, ECF 108-6 (grievance submitted at Pontiac on July 1, 2017); *id.* Exh. G ECF 108-7 (grievance submitted at Pontiac on December 10, 2017).

would have made clear to Pfister that Johnson was under the care of medical providers, to whose judgment Pfister was entitled to defer. Though the grievance goes on to request an MRI for back pain, Pfister acted reasonably by leaving this specific medical request to the medical professionals treating Johnson.

Johnson argues that Baldwin is similarly liable based on his concurring in the denial of two of Johnson's grievance appeals. These adjudications were made on July 13, 2017 and July 27, 2017, and they were in response to Johnson's grievances filed on December 29, 2016 and December 4, 2016, respectively. *See* Fifth Am. Compl. Exh. J, ECF 108-10. As explained above, Johnson has failed to adequately develop any argument with respect to the events leading him to file the December 4, 2016 grievance, so Baldwin cannot be liable for concurring in the denial of the appeal of that grievance. As for the appeal based on the December 29, 2016 grievance, Baldwin was justified in denying that appeal for the same reasons that Pfister was justified in denying the grievance --namely, he reasonably relied on the judgment of the medical professionals who were--by the terms of the grievance itself-- caring for Johnson. Indeed, the denial of the appeal expressly states as its reason for denial: "Per medical - offender was seen and received treatment deemed appropriate by facility medical staff." *Id.* at 2.

16

III.

Johnson also sues Wexford pursuant to *Monell* and the current Warden of Stateville and Director of the IDOC in their official capacities for his alleged injuries. But because Johnson's claims that he suffered constitutional violations at the hands of the individual defendants fails, these claims fail too. *See Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (dismissing *Monell* claim against Wexford because "there is no proof of an underlying constitutional violation by any individual Wexford defendant"). Alternatively, summary judgment is appropriate on Johnson's *Monell* claim against Wexford because he bases that claim on arguing that Wexford's imaging policy delayed his receipt of an MRI, but as explained above, failed to introduce evidence that an MRI was required. And summary judgment is also warranted on his claim against Truitt and Hughes because he supplies no evidence of a pattern and practice of inappropriate medical decisions, instead summarily responding to IDOC Defendants' argument on this point that he "has alleged a litany of inappropriate medical care decisions made at the hands of the Defendants," Resp. to IDOC Mot. at 11, ECF 168, without substantiating these allegations with evidence.

IV.

For the foregoing reasons, summary judgment is granted as to all defendants.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 25, 2024